## QUICKSALL *v.* MICHIGAN.

No. 33.   Argued February 6, 1950.—Decided June 5, 1950.

*Isadore Levin* argued the cause and filed a brief for petitioner.

*Edmund E. Shepherd,* Solicitor General of Michigan, argued the cause for respondent. With him on the brief were *Stephen J. Roth,* Attorney General, and *Daniel J. O'Hara,* Assistant Attorney General.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

Petitioner is in custody of the State of Michigan under a sentence of life imprisonment for first-degree murder, confirmed upon collateral attack by a judgment of the Supreme Court of Michigan, here challenged. He claims that he was deprived of his right to counsel to the extent that the Due Process Clause of the Fourteenth Amendment secures that right. The generalizations that are relevant to such a claim no longer call for elaboration. They have been set forth in a series of recent opinions.[1] It is now settled that, as to its administration of criminal justice, a State's duty to provide counsel, so far as the United States Constitution imposes it, is but one aspect of the comprehending guaranty of the Due Process Clause of a fair hearing on an accusation, including adequate opportunity to meet it. And so we turn to the facts of this case.

By information filed in the Circuit Court for Kalamazoo County, Michigan, on July 16, 1937, Charles Quicksall, the petitioner, was charged with the murder of one Grace Parker. She was a married woman, and Quicksall was her paramour. Petitioner had been a hospital patient, under police guard, between the time of Mrs. Parker's

---

[1] *Betts* v. *Brady,* 316 U. S. 455; *Canizio* v. *New York,* 327 U. S. 82; *Carter* v. *Illinois,* 329 U. S. 173; *De Meerleer* v. *Michigan,* 329 U. S. 663; *Foster* v. *Illinois,* 332 U. S. 134; *Gayes* v. *New York,* 332 U. S. 145; *Marino* v. *Ragen,* 332 U. S. 561; *Bute* v. *Illinois,* 333 U. S. 640; *Wade* v. *Mayo,* 334 U. S. 672; *Gryger* v. *Burke,* 334 U. S. 728; *Townsend* v. *Burke,* 334 U. S. 736; *Uveges* v. *Pennsylvania,* 335 U. S. 437; *Gibbs* v. *Burke,* 337 U. S. 773.

death on July 2 and July 15, when he was taken before the Municipal Justice Court where, after waiving examination, he was bound over for trial. On arraignment the next day before the Kalamazoo Circuit Court he pleaded guilty to the charge of murder. There is no evidence that at the time of his plea petitioner requested counsel or that appointed counsel was offered him. The circumstances attending the plea were thus formally stated by the judge who received it:

> "The record may show that this respondent [petitioner] has just offered to plead guilty and has pleaded guilty to a charge of murder; that after a full statement by the respondent in response to numerous questions by the Court in open Court and after a private interview with respondent at chambers, in both of which he has freely and frankly discussed the details of this homicide as claimed by him, the Court being clearly satisfied that the plea of guilty is made freely, understandingly and voluntarily, an order has been entered accepting such plea of guilty." [2]

As required by the local law, the court then proceeded to inquire into the degree of crime. Mich. Stat. Ann. § 28.550 (Henderson 1938). The course of this inquiry is shown by a summary of what developed. Quicksall, who was forty-four years old at the time, had been mar-

---

[2] Mich. Stat. Ann. § 28.1058 (Henderson 1938) provides: "Whenever any person shall plead guilty to an information filed against him in any court, it shall be the duty of the judge of such court, before pronouncing judgment or sentence upon such plea, to become satisfied after such investigation as he may deem necessary for that purpose respecting the nature of the case, and the circumstances of such plea, that said plea was made freely, with full knowledge of the nature of the accusation, and without undue influence. And whenever said judge shall have reason to doubt the truth of such plea of guilty, it shall be his duty to vacate the same, direct a plea of not guilty to be entered and order a trial of the issue thus formed."

ried and divorced twice. He had served penitentiary terms in Ohio and Michigan. He had lived with the Parkers in Ohio and in Kalamazoo, and he had become "intimate" with Mrs. Parker. She and Quicksall had made an agreement that if they "ever got caught" in their "unlawful intimate relationship" they "would die together." About a week before Mrs. Parker's death on July 2, petitioner was asked by her husband to leave his house, but on that day, at Mrs. Parker's request, he returned to see her. She told him that her husband had threatened to leave and divorce her, and she asked Quicksall to keep their agreement to die together. Thereupon she produced a revolver, and petitioner shot her and then himself. Neighbors who reached the Parker house shortly thereafter saw Mrs. Parker, very near death, lying on a bed, with a revolver near her. On being asked who shot her, she replied, "Charley did." Petitioner was lying on the floor, unconscious, next to the bed. A deputy sheriff who searched the premises found a note on the dresser in the bedroom reading: "July 2, 1937. I am dying, Grace and I together, because we cannot live apart. Charles Quicksall."

At the conclusion of these proceedings the court stated:

"In this case, the respondent [petitioner] having been arraigned on the information charging him with murder, and having pleaded guilty thereto and said plea of guilty having been accepted by the Court, after an exhaustive interview with the respondent both in open Court and at chambers, and the Court having proceeded with an examination of witnesses to determine the degree of the crime, after hearing the testimony of the witnesses Horace Cobb, Jessie Pierce, Cora Ketter and Charles Conner, and the testimony of the respondent, himself, unsworn, regarding the circumstances of this crime, and it appearing from the testimony of such witnesses and

from the statement of the respondent that the killing was deliberate and premeditated, and under the testimony of the respondent himself that it was in pursuance of a suicide pact, so-called, the Court finds and determines that respondent is guilty of murder in the first degree, and it is, therefore, ordered and adjudged that respondent be and he is guilty of murder in the first degree."

Michigan, as is well known, having long ago abolished capital punishment, Quicksall was sentenced to solitary confinement at hard labor for life. Mich. Stat. Ann. § 28.548 (Henderson 1938).

Almost ten years after his sentence, on April 18, 1947, the petitioner asked the Circuit Court for Kalamazoo County to vacate it and to grant him a new trial. He claimed the sentence had a constitutional infirmity in that he did not have the assistance of counsel and was prevented from communicating with counsel of his choice while he was hospitalized. He also claimed that his plea of guilty had been induced by misrepresentations on the part of the prosecuting attorney and the sheriff who, he asserted, had told him that the charge against him was manslaughter for which his sentence would be from two to fifteen years.

The motion to vacate the sentence was heard before the same judge who had received his plea of guilty and sentenced him. Petitioner was asked whether he desired to have a lawyer in this proceeding, and he replied that he did not: "Well, your Honor, it took me a long time to prepare the motion, and I figure that I would be just as well qualified to present it myself." In answering questions propounded by the judge, petitioner admitted that he knew he had been bound over on a murder charge. He also recalled that after the judge had informed him that his guilt had been determined to be of murder in the first degree he was given full opportunity to say

what he had to say before sentence was imposed, but had nothing to say. Cf. *Canizio* v. *New York,* 327 U. S. 82. However, he professed not to be able to recall details of the proceedings because of illness at the time. A deputy sheriff who had guarded petitioner during his hospitalization after the shooting testified that on the following day petitioner had said to him: "How long will I have to lay here? I wish to Christ it had taken effect on me like it did on her. If I get over this it will mean life for me anyway." Notes made contemporaneously supported this testimony. The prosecuting attorney at the time of sentencing was by reason of paralysis unavailable as a witness. The sheriff testified that neither he nor the prosecuting attorney, so far as he had knowledge, had refused petitioner permission to communicate with his family, friends, or a lawyer. Petitioner cross-examined the sheriff, but declined to question the deputy sheriff.

The trial judge took no stock in the reconstructing memory of the petitioner and denied his motion. The Supreme Court of Michigan affirmed. 322 Mich. 351, 33 N. W. 2d 904. We brought the case here out of a zealous regard for due observance of the safeguards of the Fourteenth Amendment in the enforcement of a State's penal code. 336 U. S. 916. The record exacts the holding that the petitioner has failed to sustain the burden of proving such a disregard of fundamental fairness in the imposition of punishment by the State as alone would justify this Court to invalidate the sentence by reason of the Due Process Clause.

Petitioner makes no claim that he did not know of his right to be assisted by counsel, see Mich. Stat. Ann. § 28.854 (Henderson 1938), and in view of his "intelligence, his age, and his earlier experiences in court," the Supreme Court of Michigan rejected the notion that he was not aware of his right to be represented by an attorney. 322 Mich. at 355, 33 N. W. 2d at 906. Cf. *Gryger*

v. *Burke,* 334 U. S. 728, 730. Since the Michigan courts disbelieved petitioner's allegations that he had not been allowed to communicate with his family, his friends or a lawyer, and no request was made by him for legal aid, the only question is whether, in the circumstances of this case, the failure of the record to show that he was offered counsel offends the Due Process Clause.

At least "when a crime subject to capital punishment is not involved, each case depends on its own facts." *Uveges* v. *Pennsylvania,* 335 U. S. 437, 441; *Betts* v. *Brady,* 316 U. S. 455, 462. To invalidate a plea of guilty the prisoner must establish that "for want of benefit of counsel an ingredient of unfairness actively operated in the process that resulted in his confinement." *Foster* v. *Illinois,* 332 U. S. 134, 137; see *Gibbs* v. *Burke,* 337 U. S. 773, 781. Here petitioner's claim that the consequences of his plea of guilty had been misrepresented was disbelieved by the tribunal especially qualified to sit in judgment upon its credibility. See *Wade* v. *Mayo,* 334 U. S. 672, 683–84. In the light of what emerged in this proceeding upon a scrutiny of what took place before the same judge ten years earlier, when petitioner's plea of guilty was tendered and accepted, it would stultify the Due Process Clause to find that any right of the petitioner was infringed by the sentence which he incurred.[3] *Foster* v. *Illinois, supra* at 138; *Bute* v. *Illinois,* 333 U. S. 640, 670–74.

*Affirmed.*

Mr. Justice Black dissents.

Mr. Justice Douglas took no part in the consideration or decision of this case.

---

[3] Assertions now made concerning irregularities in the hearing on the degree of the crime were not urged before the Michigan courts. They cannot be considered here for the first time, even as to their supposed bearing on the right to counsel.